Davis, J.
This was an action by the appellee, Matilda Nitterhouse, against the appellant on a policy of insurance for two thousand dollars issued on the life of the appellee’s,late husband, George Washington Nitterhouse.
It is provided in the policy, a copy of which is filed with the complaint, that it is issued and accepted upon certain express agreements which are declared to be conditions precedent to the contract.
One of the provisions of the second condition is that if the assured, George Washington Nitterhouse, “shall * * * ¿¡je by suicide, whether the act be voluntary or involuntary, felonious or otherwise, or whether the insured be sane or insane at the time of the act, * * * then this policy shall be null, void and of no effect, except in the cases provided for by the sixth condition of this policy.”
In the sixth condition of said policy it is provided that if the insured “shall die by suicide * * *' during the continuance of this policy, then the full net value of this policy, per American Experience Table of Mortality and 4>í per cent, interest and no more shall be paid.”
The appellant filed an answer in four paragraphs.
The first paragraph of the answer was a general denial.
In the second, third and fourth paragraphs of answer, all of which purported to be but partial answers to the complaint, the appellant averred, in different forms, that the insured came to his death by .suicide and prayed that *157 appellee should be limited in her recovery to • the net value, at the time of her husband’s death, of said policy, per American Experience Table of Mortality and 4% per cent, interest, which the appellant averred (and which the court afterwards found) amounted to $306.36.
Appellee filed a reply and the issues thus formed were brought to trial before a jury, beginning March 8, 1893.
At the conclusion of the evidence, by agreement of the parties made in open court, the cause was withdrawn from the consideration of the-jury and submitted to the court for trial and final determination in the circuit -court upon the evidence then in the record.
On the 11th of March, 1893, the court, after having heard argument of counsel, took the cause under advisement, and, nearly a year thereafter, to wit, on the 2d of February, 1894, it made a special finding of facts, at the request of the appellant, and stated its conclusion of law thereon.
The finding in reference to the manner in which the insured came to his death is as follows:
“Third. The court further finds that at the time of his death said George W. Mtterhouse was 45 years of age, and, by his marriage with the plaintiff, had four children, who survived him, to wit, two daughters aged 17 and 15 years, and two sons aged 12 and 7 years; that on the 27th day of August, 1891, he was injured from a fall, in the left side near the seventh rib, and on the seventh or eighth day of December, 1891, he went, on the advice of his attending physician, who accompanied him, to Chicago, Illinois, where his seventh rib was removed by a surgeon, ’and the wound sewed up; that he remained in the hospital at Chicago for about three weeks, when he returned to his home at Monon, Indiana, at which time his wound was healed up and was doing well, and on the 13th day of January, *158 1892, lie believed he was getting along splendidly; that afterwards, and before the 24th day of January, 1892, said wound broke out afresh, andón said 24th day of January, 1892, he was advised by his attending physician to return to Chicago for further treatment, and felt some discouragement then; that he consented, and promised to return to Chicago for such treatment, and afterwards, on the 28th day of January, 1892, he again asserted that he was going to Chicago to obtain treatment for his said injury; that during said month of January he was confined to his home, and was not able to attend to his duties as foreman of the shops of the Louisville, New Albany and Chicago Railway Company, at Monon, other than to keep the books required to be kept by him as such foreman; that he remained in the employment of said railway company, and kept said books at his home up to the day of .his death; that on the night before his death he slept well, and in morning ate a hearty breakfast; that said decedent was the owner of a thirty-eight calibre revolver, which was self-cocking, and had five chambers, and when loaded the chambers could not be revolved without raising the hammer; that prior to his said departure to Chicago, said revolver was kept in his drawer at the shops of said railway company; that during his absence at Chicago one of the employes of said company caused said revolver, without the knowledge of the decedent, to be brought to the house of the plaintiff, and it was by her placed in the north upper drawer of a, bureau in the bedroom occupied by her daughter in said house, and said drawer was locked; that a day or two before the 30th day of January, 1892, said decedent obtained the key to said drawer, where said revolver was, for the purpose, as he stated, of procuring some letters which belonged to him, and which were kept in said ■bureau drawer; that afterwards, on the morning of the' *159 30th of January, 1892, at about 8 o’clock, said decedent went to said room where said revolver was kept as aforesaid, and shortly thereafter a pistol shot was heard in said room, and upon persons entering, said George W. Nitterhouse was found lying on his back on the floor, unconscious, and in a dying condition, and with a bullet hole near the center of his forehead; that when he was so found, he held said revolver in his right hand, the last three fingers thereof resting on the handle of said revolver, his index finger on its trigger, his thumb just back of the hammer of said revolver, and his right hand, which held said revolver, was resting on his body, bent in towards the stomach, and the muzzle of said revolver, two chambers of which were empty, was pointing towards his head.
The court further finds that said revolver was a self-cocker, and when loaded could be discharged by simply pulling the trigger, or by cocking the hammer and pulling the trigger; that when the hammer was down it rested between two cartridges, but on raising the hammer, the cylinder containing the cartridges revolved so as to bring in front of, and beneath, the hammer one of said cartridges. The revolver was known as an American Bull Dog of thirty-eight calibre.
The court further finds that there were no powder burns or marks on the face or forehead of the decedent; that some blood escaped from the wound in the forehead; that the skin of the forehead was not removed or denuded except in the space covered by said bullet hole, at and about which there were neither depression nor lividityof the skin; that at the time the pistol was discharged, it was not in the immediate contact. with the face or forehead of the deceased; that it was so far distant from the forehead of the decedent that no powder marks could be made on the forehead or face of the deceased; that *160 prior to the death of the decedent, he in no way or man< ner expressed any desire or purpose of committing suh cide, and at and prior thereto he was and had been living on the most affectionate terms with all the members of his family.
The court further finds that said decedent came to his death by accidentally shooting himself with said revolver, near the middle of the forehead, the bullet therefrom making a slightly downward course and going nearly through his head; that just before said revolver was discharged, the decedent was holding it in his right-hand with his index finger on the trigger.”
The appellant thereafter filed a written motion and reasons for a. new trial. The first cause assigned for a new trial is that the special finding of facts is not sustained by sufficient evidence. The court overruled the motion, appellant reserved the proper exception, judgment was rendered in favor of appellee for $2,199.30, and appellant, within the time allowed,filed abill of exceptions containing the evidence.
The error relied on for a reversal is that the court below erred in overruling appellant’s motion for a new trial.
The contention of counsel for appellant is that Nitterhouse died by suicide, and that the finding of the court that he died by accident is wholly unsupported by the evidence.
The appellant alleges in an affirmative answer that the insured came to his death by suicide. The issue thus made placed the burden upon the appellant to satisfy the trial court, by a fair preponderance of proof, of the truth of this defense. Home Benefit Assn. v. Sargent, 142 U. S. 691; Phillips v. Louisiana Equitable Life Ins. Co., 21 Amer. Rep. 549.
On the trial appellee read in evidence the certificate of *161 the attending physician, who states therein that in his ■opinion the insured committed suicide. Appellant introduced in evidence the coroner’s verdict, which finds that the insured committed suicide. Also, appellant read in evidence a letter written by appellee in which she says that the insured, while temporarily insane, shot himself.
Counsel for appellant insist that all the evidence is confirmatory of, and none of it is antagonistic to, the statement of the physician constituting a part of the proof of loss, that the insured came to his death by suicide.
This is not the vital question presented for our consideration. The real question we are called upon to determine is whether all the evidence establishes, without controversy, the fact that the insured committed suicide. The burden was upon appellant to establish this issue to the satisfaction of the trial court by a fair preponderance of the evidence, and this appellant was required to do, not by a prima facie case alone, but by such proof as would withstand and overthrow all of the evidence to the contrary. Carver v. Carver, 97 Ind. 497 (511.)
The statements in the proofs of death, either of facts or of opinion, are not conclusive. Bachmeyer v. Mutual Reserve Fund Life Assn., 52 N. W. Rep. 101; Home Benefit Assn. v. Sargent, supra.
This court can not disturb the finding of the trial court unless there is an entire absence of evidence'tending to support some material point in issue.
We will now refer to some of the facts disclosed by the evidence: It appears that Mtterhouse had money and friends, a wife and four children; that his domestic relations were pleasant, and that he was sober and industrious. There was nothing shown in the previous history of his life to warrant the assertion that he came to *162 his death by suicide. No reason existed for taking his own life, unless his injury, suffering and the despondency incident thereto can be assigned as such reason. During the whole time of his sickness, not a murmur is shown to have escaped his lips. Pie never complained of his condition. The pistol which he held in his hands at the time of his death was his own, and had been kept at the shop where he worked. In the absence of Nitterhouse in Chicago in December the pistol or revolver was brought or sent to the house where he lived, and was taken by Mrs. Nitterhouse and placed in a bureau drawer and locked up. Her husband knew nothing of the revolver being in the house. Some two or three days before his death he made inquiry of his wife as to where the key to the drawer was, as he was anxious to get possession of some business letters in said locked drawer. She informed him of the place where the key was kept, but whether he went to the drawer at this time is unknown.
On the night before his death he slept well, and in the morning he partook of a hearty breakfast. The two daughters, Plelen and Mary, slept in the front bed-room up stairs, in which room the father that morning met his death. Soon after the deceased had risen from the breakfast table, and while Helen was' still in her bedroom, her father, as she testifies, “came up stairs and brought me my clothes, and told me to hurry and get dressed and go down and get the kitchen cleaned up.” Mrs. Nitterhouse testifies that this occurred while Mr. Newbold, who had called to see her husband, was in the sitting-room, and that as Helen’s clothes had been left there the night before, she could not come down for them.
Plelen says she was down stairs within five minutes after her father’s visit to her room, and, as she passed *163 into the kitchen, she saw her father in the sitting-room, but says nothing about seeing Mr. Newbold there. This was the last time she saw her father alive. Within five minutes after that (at about eight o’clock) the report of a pistol was heard in the bed-room just vacated by the daughter, and the father was found, by those rushing in, on his back upon the floor in front of the mirror, with the bullet hole in his forehead and in the condition described in the special finding. No one was present when he was shot. Nothing is kjiown as to whether he was shot accidentally or otherwise, except as may be inferred from the facts and circumstances.,
Dr. Clayton, who saw the body the next day, testified in reference to the appearance, size and location of the hole in the forehead, as follows:
“Q. Did you examine the wound? A. No, sir; I just went in and looked at him, was all.
“Q. Did you see the hole in his head? A. Yes, sir, I did.
“Q,. Did you examine the wound to see what direction the ball took? A. No, sir.
“Q. Did you examine the back of the head? A. No sir.
“Q,. You.may state the appearance and size of the hole, and about where it was. A. It was about the center of the forehead, or near so.
“Q,. How much above the nose and eye? A. Well, I should think about midway, about the center of the forehead.
“Q. You may state how large the hole was. A. Well, it looked like it was produced by about a thirty-two caliber revolver, may be larger than that; I am not experienced and can’t say the size.”
Dr. Sampson, the coroner, testified as follows:
“Q. You may describe the appearance of the hole in *164 the forehead, if you observed it, how large it was and what its appearance was. A. Well, it was very large; about the size that a thirty-caliber bullet would make, naturally going through the skull and it had discolored the skin a little bit.”
Robert Gray says: “I think the skin was burned a little if I remember right, I won’t say positive.”
“Q. I will ask you to state, Mr. Gray, if you saw any marks upon the forehead or face of Nitterhouse that indicated powder burns. A. No, sir.”
Counsel for appellant insist:
1. That the undisputed facts in the case exclude the possibility of any kind of an accident.
2. The fact that there were no powder marks upon his face proves conclusively that the muzzle of the revolver, when the pistol was discharged, was in close contact with his forehead, and that therefore the shooting was intentional.
It should be remembered in this connection that the statements in the physician’s certificate and in the coroner’s verdict that the insured committed suicide, and in the letter of appellee that the insured, while temporarily insane, shot himself, are merely the expression of opinions and were not in the court below and are not here in any sense conclusive. It should also be borne in mind that so strong is the instinctive love of life and so uniform the efforts of men to preserve their existence that suicide can not be presumed. The presumption is that the death of the insured was not voluntary. Waycott v. Metropolitan Life Ins. Co., 24 Atlantic Rep. 992.
In such cases where the proofs of death and the entire evidence introduced on the trial leave it in doubt how the death of the insured was caused, the question must be determined by the jury or trial court. Home Benefit Assn. v. Sargent, supra.
*165 In the last case cited the court says: “But the defendant was not prejudiced by the statements and opinions contained in the proofs of death, and the plaintiff was not estopped thereby, as a matter of law. When the court was asked to charge the jury that by the introduction of those proofs the burden was shifted, the evidence was all before the jury, and was much more full and complete than that upon which Dr. Jenkins had based his opinion. He himself had been examined as a witness, and had testified, to what he knew or did not know at the time he made his certificate, and all the facts of the case, so far as they were known, had been explained in view of the contents of the proofs of death. It appeared that most of the statements in the certificate of Dr. Jenkins were based on hearsay. * * * The jury were entirely at liberty to properly find that that wound, although self-inflicted, was accidental.”
In Phillips v. Louisiana Equitable Life Ins. Co., supra, the court says: “Did the insured die by his own hand? The onus of proof is on the party who affirms this fact. And we do not think it has been legally proved. It is true that the witnesses who testify as to his death express it as' their opinion that he killed himself or committed suicide; but their opinion can not be regarded as evidence of the fact. Nor do the facts and circumstances proved point to the voluntary self-destruction of the insured to the exclusion of all other reasonable hypotheses. All the facts and circumstances proved in regard to his death, are that he retired to his room at bedtime and about one o’clock at night the report of a pistol was heard. When the inmates of the house came to the room, the insured was found in a reclining posture on the sofa, and a pistol was lying on the floor near by. He had been shot in the mouth. It is possible that he might have shot himself accidentally. * * * The evidence *166 being circumstantial only, proves nothing, since it does not exclude all other reasonable hypotheses.”
In our opinion, the absence of the powder marks upon his face, in the light of the other facts and circumstances in the case, do not show conclusively that the muzzle of the revolver when discharged was in close contact with his forehead and that the shooting was intentional.
We quote from section 287, vol. 3 (4th ed.), Wharton and Stille’s Medical Jurisprudence, as follows: “Gunshot wounds present striking differences in their appearance, according to the distance at which the piece was fired, and the number and character of the projectiles. If exploded in immediate contact with the body, the wound is large and circular, the skin denuded, blackened and burned, and the point at which the ball entered is livid and depressed. The blackened and burned appearance of the skin is due to the imperfect combustion of the grains of powder.”
If the piece is held near, but not in immediate contact with the body, the authors say: “The eyebrows, lashes and lids were completely burned, and a large number of grains of powder had imbedded themselves in the cheek. Experiments being made in order to determine the distance required to produce these effects, it was found that the weapon must have been held within a foot’s distance.” Wharton and Stille’s Medical Jurisprudence, section 287, vol. 3 (4th ed.).
In the case under consideration, the conditions either as to “contact” or “near” wounds are not clearly shown to exist. His face and forehead did not present the appearance described by the authorities. The evidence tended to prove that there were no powder marks or burns about his face. The wound, as to appearance and size, seems to have been natural, and the skin at the point of entry was not livid and depressed.
*167 Filed Nov. 23, 1894.
In our judgment, .from these facts and circumstances and all the other facts and circumstances disclosed by the evidence, the trial court was authorized in drawing the inference, not only that the revolver was held at a distance when fired, but also that the shooting was accidental and not intentional.
We find no reversible error in the record.
Judgment affirmed.